## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

LISA S.,

        Plaintiff,

    v.

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

Civil Action No. 1:22-cv-04577

**OPINION**

**APPEARANCES**:

Daniel S. Jones
LAW OFFICE OF CHARLES E. BINDER AND HARRY J. BINDER, LLP
485 Madison Avenue
Suite 501
New York, NY 10022

    *On behalf of Plaintiff.*

Philip R. Sellinger
United States Attorney
U.S. DEPARTMENT OF JUSTICE
OFFICE OF THE U.S. ATTORNEY
401 Market Street
P.O. Box 2098
Camden, NJ 08101

Andrew C. Lynch
Special Assistant United States Attorney
C/O SOCIAL SECURITY ADMINISTRATION
OFFICE OF PROGRAM LITIGATION,
OFFICE OF THE GENERAL COUNSEL
6401 Security Boulevard
Baltimore, MD 21235

    *On behalf of Defendant.*

**O'HEARN, District Judge.**

This matter comes before the Court on Plaintiff Lisa S.'s[1] appeal from a denial of Social Security disability benefits by the Acting Commissioner of Social Security ("Defendant"). The Court did not hear oral argument pursuant to Local Rule 78.1. For the reasons that follow, the Court **AFFIRMS** the Administrative Law Judge's ("ALJ") decision.

## I.   BACKGROUND

The Court recites herein only those facts necessary for its determination on this Appeal.

### A. Administrative History

On June 23, 2017, Plaintiff protectively filed applications for Social Security benefits under Title II for a period of disability and disability insurance benefits ("DIB") and Title XVI for supplemental security income ("SSI"), alleging that she has been disabled since September 28, 2016. (AR 21). The applications were denied initially on October 24, 2017, and upon reconsideration on February 23, 2018. (AR 21). Thereafter, Plaintiff filed a written request for a hearing before an ALJ on April 20, 2018. (AR 21). The ALJ held a hearing on August 27, 2019, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert. (AR 21). In a decision dated October 29, 2019, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 32). That decision became the final decision of the Acting Commissioner when the Appeals Council declined review on August 17, 2020. Plaintiff timely filed this appeal on October 31, 2022, pursuant to 42 U.S.C. § 405(g). (ECF No. 1).

---

[1]   Pursuant to this Court's Standing Order 2021-10, this Opinion will refer to Plaintiff solely by first name and last initial.

### B.  Plaintiff's Background and Testimony

At the alleged onset of disability, Plaintiff was 37 years old and living with her boyfriend. (AR 18, 47). She finished high school, after which she graduated from trade school. (AR 31, 50). As a result of a work-related injury in early May 2012, Plaintiff alleges that she became disabled on September 28, 2016. (AR 21).

Plaintiff's initial claim on June 23, 2017, cited the following illnesses, injuries, or conditions: lumbar spine impairment, bulging disc injury, headaches impairment, herniated disc, severe back pain, degenerative disc disease, cervical spine impairment, post-concussive syndrome, and gastroparesis. (AR 79–80). At her administrative hearing, Plaintiff testified that she experiences "excruciating" pain as a result of these multiple chronic issues, as well as "chronic migraines" four-to-five times per week. (AR 27).

### C.  Medical History

Plaintiff has been examined by numerous medical professionals over the last decade, and throughout the pendency of her disability claim. The Court will briefly summarize the relevant medical evidence for purposes of this appeal. This recitation is not comprehensive.

1.  <u>Farrel Silverman, D.O.</u>

Dr. Silverman has treated Plaintiff since at least June 24, 2015. A September 24, 2015 CT scan of the spine revealed a mild posterior disc osteophyte formation and mild multilevel degenerative disc space narrowing of the thoracic spine. (AR 613, 690).

On December 10, 2015, Dr. Silverman examined Plaintiff for her chronic lower back pain and obesity. (AR 637). Thereafter, he referred Plaintiff to specialists for further treatment of her morbid obesity and sciatica. (AR 637). One month later, Plaintiff complained of migraine

headaches with associated symptoms of nausea, dizziness, photophobia, phonophobia, and insomnia. (AR 639–40).  Dr. Silverman prescribed Fioricet and Trazodone. (AR 639–40).

On March 31, 2016, Dr. Silverman conducted an MRI, which signaled a supraspinatus muscle strain and an edema, among other issues. (AR 685).  At a visit one month later, Dr. Silverman diagnosed Plaintiff with total body pain, generalized anxiety disorder, primary insomnia, blurry vision, and neck pain. (AR 646). Dr. Silverman prescribed Cymbalta and Seroquel. (AR 646).

On May 26, 2016, Dr. Silverman prescribed Plaintiff Propranolol for migraines and Zanaflex for muscle spasms. (AR 653). Two months later, Plaintiff reported constipation paired with pain and bloating, for which Dr. Silverman prescribed Colace and Lactulose. (AR 661).

At a visit on December 1, 2016, Dr. Silverman re-prescribed Fioricet upon Plaintiff's complaint of migraines despite her then present treatment. (AR 669). He also prescribed Ambien and a trial of Lunesta for insomnia. (AR 669). On January 30, 2018, Plaintiff reported increased headaches. (AR 740). Dr. Silverman recommend a neurological evaluation, as well as the continued usage of Fioricet and Ambien. (AR 740).

2. Abdul Qadir, M.D.

On June 16, 2016, Dr. Qadir began treating Plaintiff for her reported symptoms of chronic, persistent neck, mid and lower back, and left leg pain, as well as headaches. (AR 602). She reported that her pain was a result of both her work-related injury, as well as an injury from a fall at home earlier in 2016. (AR 602).  She reported that her pain was exacerbated by activities of daily living, prolonged standing or sitting, working, and cold, damp weather. (AR 602). Dr. Qadir's clinical examination showed positive results for nerve damage in Plaintiff's arms, muscle spasms and/or trigger points in the spine and lumbar muscles, among other issues. (AR 602–03).

Dr. Qadir ordered an MRI of Plaintiff's cervical spine, after which he diagnosed her with chronic pain, cervicalgia, spinal enthesopathy, low back pain with left-side sciatica, chronic post-traumatic headaches, and right shoulder pain. (AR 605–06). Dr. Qadir prescribed Percocet. (AR 605–06). A second MRI of the lumbar spine demonstrated a disc bulge, among other issues. (AR 684).

At a series of follow-up visits, Plaintiff complained of difficulties performing her work duties and daily living activities due to pain. (AR 598). She did, however, note some relief from the medication. (AR 598). Following a physical examination in which Dr. Qadir found nothing changed, and Plaintiff's continued complaints of persistent and worsening pain, Dr. Qadir increased Plaintiff's Oxycodone dosage. (AR 598). Dr. Qadir also restricted her work to no more than three days per week for a maximum of six hours per day. (AR 598). Additionally, he prescribed Gabapentin, refilled her Zanaflex prescription, and scheduled Plaintiff for joint injections on September 15, 2015. (AR 598).

On September 30, 2016, Dr. Qadir saw Plaintiff again, who reported that the relief following the injections only lasted for one week. (AR 586). She further complained of severe back pain that worsened while working despite her modified schedule, as well as neck, shoulder, and leg pain. (AR 586). Dr. Qadir conducted a physical examination, following which he refilled her Oxycodone prescription and scheduled a lumbar radiofrequency ablation. (AR 587–88).

Plaintiff returned to Dr. Qadir on October 27, 2016, reporting feet, leg, lower back, and shoulder pain, as well as numbness in the legs and feet. (AR 582). A physical examination revealed no change, following which he continued Plaintiff's then current medications. (AR 584). One month later, following Plaintiff reporting worsened symptoms and another physical examination

with no change in findings, Dr. Qadir increased her Zanaflex dosage and continued Oxycodone. (AR 573).

On December 22, 2016, at a follow-up visit, Dr. Qadir conducted a physical examination, which revealed no change despite Plaintiff's reports of a significant worsening of her symptoms. (AR 573). Thus, Dr. Qadir refilled Plaintiff's Tizanidine and Oxycodone prescriptions. (AR 573). Following a lumbar spine radiofrequency on February 9, 2017, Plaintiff reported partial pain relief on her left side only, and that she was still unable to work due to her pain. (AR 569, 571).  Dr. Qadir conducted a physical examination and found no change in his prior findings. (AR 569, 571). He increased her Gabapentin dosage and continued Oxycodone. (AR 569, 571). Approximately one month later, Plaintiff returned to Dr. Qadir reporting worsened pain as well as anxiety, depression, and frequent crying. (AR 565). Dr. Qadir conducted a physical examination and diagnosed Plaintiff with chronic pain syndrome. (AR 567–68).

In a Pain Assessment dated March 30, 2017, Dr. Qadir summarized Plaintiff's conditions and her symptoms, and opined she was not a "malingerer." (AR 857). Specifically, he stated the following opinions about her capabilities for work during a typical 8-hour shift: Plaintiff could sit for 1-2 hours with intermittent breaks to stand up and move around, as well as stand or walk for two-three hours. (AR 857). He also opined that Plaintiff could lift and carry up to 10 pounds occasionally and lift and carry up to five pounds frequently, but would need to take unscheduled, 15–20 minute breaks to rest several times throughout the day. (AR 860). He also noted that she would likely need to be absent from work over three times a month due to both her impairments and needed treatments. (AR 862).

At a series of follow-ups, Plaintiff reported that her symptoms remained the same, or in some instances, worsened. (AR 559). Specifically, Plaintiff reported ongoing lower extremity,

6

back, and neck pain; worsened chronic migraines; overall joint pain; and emotional distress. (AR 557).

### 3.   John M. Bednar, M.D.

On July 18, 2016, treating orthopedist Dr. Bednar, first evaluated Plaintiff for the following symptoms which she reported resulted from her work-related injury: right arm pain, numbness and tingling, weakness, loss of dexterity, dropping of objects, and night awakening. (AR 879). Dr. Bednar, following an electromyography ("EMG") and a physical examination, reported the following findings: evidence of a compressed ulnar nerve at the elbow and carpal tunnel syndrome; decreased range of motion in the wrist and fingers; decreased grip strength in the right hand; cervical radiculopathy involving the right arm; ulnar neuropathy on the right side; and median neuropathy on the right wrist. (AR 879). Dr. Bednar recommended a long arm splint and a carpal tunnel steroid injection for Plaintiff. (AR 881).

At a series of follow-up visits, Plaintiff reported increasing and persistent pain, particularly noting her neck, left arm, and hand pain. (AR 869). Dr. Bednar ordered a second EMG, which revealed evidence of mild sensory carpal tunnel syndrome and ulnar neuropathy at the right elbow. (AR 856–57). Dr. Bednar opined that Plaintiff's prognosis for symptom relief with surgical intervention was poor. (AR 863).

### 4.   Joseph R. Zerbo, D.O.

On October 27, 2016, Dr. Zerbo, Plaintiff's examining orthopedist, evaluated her for symptoms of lower back pain radiating into her left leg with additional associated numbness and weakness. (AR 956). Plaintiff claimed these symptoms were aggravated with prolonged sitting, standing, walking, bending, and lifting. (AR 956). Following a physical examination and a review of an MRI of the lumbar spine, Dr. Zerbo diagnosed Plaintiff with discogenic lumbar syndrome

and lumbar radiculopathy secondary to internal disc derangement and disc protrusion. (AR 957–58). He recommended additional treatment with continued pain management and physical therapy. (AR 957–58).

5. George Young, D.O.

On March 10, 2017, Dr. George Young examined Plaintiff for reported symptoms of neck, right shoulder, elbow, and lower back pain; upper extremity paresthesia; and numbness in the left lower extremity with prolonged sitting. (AR 986–87). Dr. Young diagnosed Plaintiff with lower back pain and lower extremity paresthesia; mild to moderate spinal stenosis; lumbar degenerative disc disease; and disc bulge. (AR 987–88).

6. Pete Murphy, D.C.

On October 4, 2017, Dr. Murphy, evaluated Plaintiff for chiropractic treatment. (AR 1004). A physical examination revealed various subluxations. (AR 1004). Later that month, Plaintiff returned to Dr. Murphy complaining of persistent pain, specifically in her neck, spine, lower back, and right shoulder. (AR 1003). Dr. Murphy reported muscle spasms, specifically in the cervical, thoracic, and lumbar spine, as well as cervical, thoracic, and lumbar spine, pelvic and sacrum subluxation. (AR 1003).

Approximately one year later, on November 14, 2018, Plaintiff returned to Dr. Murphy, complaining of overall sharp pain, headaches, and numbness in both legs. (AR 999). Dr. Murphy conducted another physical examination, finding an onset of new symptoms, including a decreased range of motion and spinal pain and muscle spasms. (AR 999–1000).

## II.   **LEGAL STANDARD**

### A.  Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). The United States Supreme Court has explained this standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotation marks omitted); *see also Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (internal citations and quotations omitted).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g., Fargnoli v. Halter*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.").

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)

("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at \*3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K. on behalf of K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018 WL 1509091, at \*4 (D.N.J. Mar. 27, 2018) (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (internal citations and quotations omitted)). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.,* 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114).

Although an ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)).

### B.  Sequential Evaluation Process

The Commissioner of the Social Security Administration has promulgated a five-step, sequential analysis for evaluating a claimant's disability, as outlined in 20 C.F.R. §§ 404.1520(a)(4)(i)–(v). The analysis proceeds as follows:

> At step one, the ALJ determines whether the claimant is performing "substantial gainful activity[.]" If he is, he is not disabled. Otherwise, the ALJ moves on to step two.

> At step two, the ALJ considers whether the claimant has any "severe medically determinable physical or mental impairment" that meets certain regulatory requirements. A "severe impairment" is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" If the claimant lacks such an impairment, he is not disabled. If he has such an impairment, the ALJ moves on to step three.

At step three, the ALJ decides "whether the claimant's impairments meet or equal the requirements of an impairment listed in the regulations[.]" If the claimant's impairments do, he is disabled. If they do not, the ALJ moves on to step four.

At step four, the ALJ assesses the claimant's "residual functional capacity" ("RFC") and whether he can perform his "past relevant work." A claimant's "[RFC] is the most [she] can still do despite [her] limitations." If the claimant can perform his past relevant work despite his limitations, he is not disabled. If he cannot, the ALJ moves on to step five.

At step five, the ALJ examines whether the claimant "can make an adjustment to other work[,]" considering his "[RFC,] . . . age, education, and work experience[.]" That examination typically involves "one or more hypothetical questions posed by the ALJ to [a] vocational expert." If the claimant can make an adjustment toother work, he is not disabled. If he cannot, he is disabled.

*Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 201–02 (3d Cir. 2019) (alterations in original; citations and footnote omitted).

### III.    **ALJ DECISION**

Plaintiff met the insured status requirements of the Social Security Act through September 30, 2022. (AR 23). At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity between September 28, 2016, the alleged disability onset date, and the date of the ALJ's decision. (AR 12).

At Step Two, the ALJ found that Plaintiff suffered from the following medically determinable severe impairments: "degenerative disk disease; right elbow ulnar neuropathy; gastroparesis; and migraine headaches." (AR 23). The ALJ found that Plaintiff's diagnosed obesity, major depressive order, and psychological factors affecting other medical conditions were not severe. (AR 23).

At Step Three, the ALJ found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. (AR 25).

At Step Four, the ALJ found that Plaintiff had the RFC to perform sedentary work subject to various additional limitations. (AR 26–31). The ALJ also found that this RFC did not permit the performance of Plaintiff's past relevant work as a residential rehabilitation aide. (AR 31).

At Step Five, the ALJ, relying on the testimony of the vocational expert, found that a significant number of jobs—i.e., approximately 1 million jobs as a telephone information clerk; approximately 185,000 charge account clerk jobs; and approximately 65,000 jobs as an addresser—existed in the national economy and could be performed by an individual with Plaintiff's vocational profile, which the ALJ determined to be consistent with the information contained in the Dictionary of Occupational Titles, and RFC. (AR 32). The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 32).

## IV.   <u>DISCUSSION</u>

In her appeal, Plaintiff identifies two alleged errors within the ALJ's decision regarding her disability benefits claim. First, Plaintiff argues that the ALJ's RFC analysis is flawed because he failed to properly evaluate the medical opinions of Dr. Qadir. Specifically, Plaintiff argues the ALJ did not utilize the specified factors listed in the regulations and did not rely on medical opinions to properly determine Plaintiff's RFC. (Pla. Br., ECF No. 10 at 30). Second, Plaintiff contends that the ALJ failed to properly evaluate Plaintiff's testimony. (Pla. Br., ECF No. 10 at 41). The Court does not find these persuasive and, for the reasons that follow, affirms the decision of the ALJ.

### A.  The ALJ Did Not Err In Determining Plaintiff's Residual Functional Capacity.

Plaintiff argues that the ALJ erred in failing to consider medical opinions and determine the persuasiveness of the opinions by considering specified factors listed in the regulations, in addition to failing to articulate how persuasive those opinions were found to be based on a meaningful application of those factors. (Pla. Br., ECF No. 10 at 30). The Court disagrees.

At Step Four, the ALJ assesses the claimant's RFC and whether he can perform his "past relevant work." A claimant's "[RFC] is the most [she] can still do despite [her] limitations." If the claimant can perform his past relevant work despite his limitations, he is not disabled. If he cannot, the ALJ moves on to Step Five.

A claimant's RFC is the most that the claimant can do despite the claimant's limitations. 20 C.F.R. § 404.1545(a)(1). At the administrative hearing stage, the ALJ is tasked with determining the claimant's RFC. 20 C.F.R. §§ 404.1520(e), 404.1546(c); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations.") (citations omitted). When determining a claimant's RFC, the ALJ has a duty to consider all the evidence; however, the ALJ need include only "credibly established" limitations. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *see also Zirnsak v. Colvin*, 777 F.3d 607, 615 (3d Cir. 2014) (stating that the ALJ has discretion to choose whether to include "a limitation [that] is supported by medical evidence, but is opposed by other evidence in the record;" however, "[t]his discretion is not unfettered—the ALJ cannot reject evidence of a limitation for an unsupported reason").

Here, the ALJ found Plaintiff to have the RFC to perform sedentary work except "occasional pushing and pulling with the lower extremities; occasional climbing, balancing, stooping, kneeling, crouching, and crawling; frequent reaching in all directions; frequent handling, fingering, and feeling; and frequent exposure to hazards such as unprotected heights and moving machinery." (AR 26). The SSA defines work as "sedentary" when it:

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking

and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

In determining an individual's RFC in Step Four, the ALJ must consider all relevant evidence—including "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli v. Halter*, 247 F.3d 34, 41 (3d Cir. 2001) (citing 20 C.F.R. § 404.1545(a)).

The ALJ has significant discretion in choosing whom to credit. *Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011) (citation omitted) ("[T]he ALJ is entitled to weigh all evidence in making its finding . . . [and] is not bound to accept the opinion or theory of any medical expert, but may weigh the medical evidence and draw its own inferences."). 20 C.F.R. §§ 404.1520(c)(1–5) and 416.927(c)(1–6) provide a list to consider in determining the weight afforded to opinions, including (1) supportability of the opinion afforded by the medical evidence, (2) consistency of the opinion with the record as a whole, (3) nature and extent of the treatment relationships and (4) specialization of the treating physician, among other factors. *Annette S. v. Comm'r of Soc. Sec.*, No. 21-10614, 2022 WL 2304771, at *7 (D.N.J. June 27, 2022). The ALJ must not "explicitly discuss each factor in his decision." *Samah v. Comm'r of Soc. Sec.*, No. 17-08592, 2018 WL 6178862, at *5 (D.N.J. Nov. 27, 2018). Rather, the ALJ only needs to "articulate some level of analysis of a particular line of evidence." *Phillips*, 91 F. App'x at 780.

In utilizing medical opinions to determine an individual's RFC, the regulations require an ALJ to consider the opinion's persuasiveness. 20 C.F.R. § 404.1520c(a). The two most important factors in doing so are supportability and consistency, and failure to thoroughly evaluate these factors is error. *Andrews v. Kijakazi*, No. 20-1878, 2022 WL 617118, at *21–22 (M.D. Pa. Mar. 2,

14

2022). The supportability of the opinion describes the "extent to which a medical source has articulated support for the medical source's own opinion." *Cota v. Kijakazi*, No. 21-672, 2022 WL 3686593, at *7 (M.D. Pa. Aug. 25, 2022) (citation omitted). Consistency compares the medical opinion with other medical opinions in the record as well as the relevant evidence in the record. 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2); *Phillips v. Comm'r of Soc. Sec.*, 91 F. App'x 775,780 (3d Cir. 2004). Further, the ALJ will "not defer or give a specific evidentiary weight, including controlling weight, to any medical opinions . . . including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead of assigning weight to medical opinions, under the updated regulations, the ALJ simply considers the persuasiveness of medical opinions. *Id.*

Here, Plaintiff contends that the ALJ failed to articulate how he considered evidence relevant to the factors of supportability and consistency when evaluating opinions in the record, specifically from Plaintiff's treating specialist, Dr. Qadir. (Pla. Br., ECF No. 10, at 31–34). In evaluating Dr. Qadir's opinion, the ALJ stated:

> The undersigned does not find Dr. Qadir's opinion persuasive, as he mostly checked off or circled answers on a form with little supporting explanation. Dr. Qadir noted merely the claimant's lumbar spine impairment as the basis for his conclusions and he seems to overstate the degree of the claimant's limitations based on his own treatment notes showing that the claimant's pain was adequately controlled. Further, it is not well supported or consistent with the overall medical evidence of record discussed above including the objective diagnostic findings that do not typically cause severe lower extremity numbness while sitting and the objective clinical findings of normal muscle strength in her lower extremities, normal gait, negative straight-leg raisings, and the ability to perform both toe and heel walking, bilaterally.

(AR 30).

The ALJ explicitly addressed whether Dr. Qadir's medical testimony was internally supported and consistent with the record as a whole as required by the regulations. (AR 30). The ALJ recited progress notes by Dr. Qadir in which Plaintiff (1) reported that her pain was adequately controlled and (2) retained normal strength, gait, and flexion. (AR 28–30, 747–76). As such, the Court finds that the ALJ adequately addressed the factors of supportability and consistency as required by 20 C.F.R. 404.1520(c)(1)–(5). *See, e.g.*, *Tyler E. K. v. Comm'r of Soc. Sec.*, No. 21-9623, 2022 WL 3913559, at *6 (D.N.J. Aug. 31, 2022) (finding no error where the ALJ specifically considered the supportability and consistency factors by citing the doctor's treatment notes and other evidence in the record that were inconsistent with the doctor's recommended limitations). To the extent Plaintiff asks this Court to re-weigh the evidence that was fully considered by the ALJ, this Court declines to do so. *See, e.g.*, *Alycea K. v. Kijakazi*, No. 17-02683, 2022 WL 17733663, at *7 (D.N.J. Dec. 16, 2022) ("Plaintiff . . . asks this Court to re-evaluate the weight assigned to evidence that was adequately considered by the ALJ. This Court declines to do so.").

On a final note, the Court addresses Plaintiff's argument that the ALJ incorrectly recited the nature of Dr. Qadir's testimony. (Pla. Br., ECF No. 10, at 32). Specifically, the ALJ stated, "[T]he record contains an assessment form completed by Dr. Qadir . . . he mostly checked off or circled answers on a form with little supporting explanation." (AR 30). The Court agrees with Plaintiff that this recitation is inaccurate as the notes provided by Dr. Qadir are more elaborate than indicated, but disagrees that it requires remand. At the first four steps, "[p]laintiff . . . bears the burden, on appeal, of showing not merely that the Commissioner erred, but also that the error was harmful." *Hill v. Comm'r of Soc. Sec.*, No. 19-20115, 2020 WL 7694007, at *2 (D.N.J. Dec. 24, 2020). Where an error would not change the outcome of the case, it is harmless. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009); *Woodson v. Comm'r Soc. Sec.*, 661 F. App'x 762, 765–66

(3d Cir. 2016). Here, the ALJ considered the entirety of Dr. Qadir's medical testimony in conjunction with the other medical opinions in the record. He recited Dr. Qadir's notes spanning multiple paragraphs with in-depth consideration of the tests and treatment conducted. (AR 28–30). Despite failing to acknowledge Dr. Qadir's written statements, there is substantial evidence to support the ALJ's decision to afford Dr. Qadir's opinion little weight. *See supra* discussion on pages 15–16. And there is no evidence that the ALJ improperly rejected Dr. Qadir's opinions solely on the basis that they were provided in a questionnaire report. *See Harvey v. Acting Comm'r of Soc. Sec.*, No. 16-2524, 2017 WL 2616923 *5, n.3 (D.N.J. June 16, 2017) (explaining that there must be other good reasons besides the form of medical opinions for the ALJ to discount such evidence). As such, the ALJ's error is harmless and insufficient to justify remand. *See, e.g.*, *D.F. v. Comm'r of Soc. Sec.*, No. 20-9397, 2022 WL 1591382, at *2 (D.N.J. May 19, 2022) (finding harmless error where the ALJ incorrectly recited evidence because the ALJ's decision was nonetheless supported by substantial evidence in the record).

**B. The ALJ Properly Considered Plaintiff's Subjective Complaints and Was Not Bound by Them to the Extent That They Were Not Supported by Objective Evidence in the Record.**

Plaintiff further argues that the ALJ failed to properly evaluate Plaintiff's testimony regarding the severity of her impairments and limitations. (Pla. Br, ECF No. 10 at 41–42). The Court disagrees.

Subjective allegations of pain or symptoms do not alone establish a disability. *See Miller v. Comm'r of Soc. Sec.,* 719 F. App'x 130, 134 (3d Cir. 2017); 20 C.F.R. § 416.929(a)). Rather, objective medical evidence is required to corroborate the subjective complaints of the claimant. *Prokopick v. Comm'r of Soc. Sec.*, 272 F. App'x 196, 199 (3d Cir. 2008) (citing 20 C.F.R. §

404.1529(a)); *see also Christopher F. v. Kijakazi*, No. 21-516, 2022 WL 9169835, at *8 (D.N.J. Oct. 14, 2022).

In evaluating a Plaintiff's subjective testimony, the ALJ must first "consider whether there is an underlying medically determinable physical or mental impairments" that could reasonably be expected to produce the individual's pain or other symptoms. *See* Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029. Following this inquiry, the ALJ must then evaluate the "intensity, persistence, and limiting effects of the individual's symptoms" to determine the extent to which the individual's ability to do basic work activities is limited. *Id.* The ALJ is further required to provide a specific explanation as to why a claimant's statements are discounted with respect to the intensity, persistence, and limiting effects of their statements. *See Hendry v. Comm'r of Soc. Sec.,* No. 16-08851, 2018 WL 4616111, at *13 (D.N.J. Sept. 26, 2018); *see also Scott R. v. Kijakazi*, No. 21-19519, 2022 WL 17352238, at *8 (D.N.J. Nov. 30, 2022). This two-part inquiry should be used to evaluate impairment-related symptoms alleged by a claimant and must be completed without using the term "credibility" in accordance with 20 C.F.R. § 404.1529. SSR 16-3p.

The ALJ is required to consider a number of factors before making a conclusion regarding the validity of a claimant's testimony regarding symptoms and subsequent limitations, including: the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pin or other symptoms; measures other than treatment the individual uses or has used to

relieve pain or other symptoms; and any other relevant factors concerning the individual's functional limitations and restrictions. SSR 16-3p.

Here, the ALJ followed this two-step evaluation process. The ALJ first considered Plaintiff's underlying, medically determinable physical or mental impairments, specifically referencing her chronic pain, stomach issues, and chronic migraines. (AR 27). He found that these impairments could cause the alleged symptoms but, ultimately, that "the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." (AR 27–28).

In support of that finding, the ALJ identified multiple medical sources—physical examinations, doctor's notes, and medical opinions—that contradict the severity of Plaintiff's subjective complaints. The ALJ recounted the testimony of Dr. Young who stated that Plaintiff's disc bulge and spinal stenosis would not typically cause the type of lower extremity numbness of which she complains and noted that Plaintiff did not report this complaint to her primary care provider or emergency room staff. (AR 29, 994). Additionally, the ALJ relied upon Dr. Qadir's progress notes in which Plaintiff regularly reported that her pain was well managed and consistently yielded positive tests showing she was able to walk heel to toe, and had normal gait, strength, and flexion. (AR 29, 747–76). As for Plaintiff's migraines, the ALJ recounted Dr. Silverman's notes that Plaintiff's symptoms were not intractable and improved by medication. (AR 30, 653, 657, 669). Despite this evidence, the ALJ nonetheless limited Plaintiff to sedentary work subject to various additional limitations which was, notably, more limitations than recommended by state consulting medical examiners. (AR 26–31). For all these reasons, the Court concludes that the ALJ sufficiently considered Plaintiff's subjective testimony and the RFC is supported by substantial evidence in the record.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court **AFFIRMS** the final decision of the Commissioner.

An appropriate Order will follow.

_____
**CHRISTINE P. O'HEARN**
**United States District Judge**